UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 AUG 23  PM 4: 07

CLERK
BY_____
DEPUTY CLERK

PICKET FENCE PREVIEW, INC., )
)
Plaintiff, )
)
v. )          Case No. 2:21-cv-00012
)
ZILLOW, INC., )
)
Defendant. )

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT
(Doc. 29)

Plaintiff Picket Fence Preview, Inc. brings this action against Defendant Zillow, Inc.,
alleging violations of the Vermont Consumer Protection Act (the "VCPA"), 9 V.S.A.
§ 2453(a) (Count I), and the Lanham Act, 15 U.S.C § 1125 (Count II), arising out of
Defendant's policy of providing free online listings for homes that are For-Sale-By-
Owner ("FSBO"). Plaintiff is seeking compensatory and exemplary damages as well as
injunctive relief.

Plaintiff filed its original Complaint on December 16, 2020 in Vermont state court.
On January 19, 2021, Defendant removed the action to this court, and on February 25,
2021, it filed a motion to dismiss Plaintiff's Complaint. On August 19, 2021, the court
issued an Opinion and Order granting Defendant's motion to dismiss and granting leave
to amend to file a First Amended Complaint ("FAC"). On September 21, 2021, Plaintiff
filed its FAC. (Doc. 24-1.)

Pending before the court is Defendant's motion to dismiss Plaintiff's FAC on the
grounds that Plaintiff lacks standing to bring suit on behalf of third parties and otherwise
fails to state a claim for which relief can be granted. (Doc. 29.) On December 13, 2021,

Plaintiff opposed the motion, and on January 11, 2022, Defendant replied. Oral argument was held on May 9, 2022, at which time the pending motion was taken under advisement.

Plaintiff is represented by Thomas C. Nuovo, Esq. Defendant is represented by Heather P. Lamberg, Esq., Kevin M. Henry, Esq., and Lauren Gailey, Esq.

## I.   Allegations in the FAC.

Plaintiff commenced operations in 1993 and was one of the first publications to provide a marketplace where private homeowners could pay to advertise their property directly to potential buyers, bypassing the use of real estate agents or brokers. Plaintiff contends that "FSBO is a term of art that refers to a specific method of selling a property." (Doc. 24-1 at 3, ¶ 11.) Plaintiff defines a FSBO seller as "a person who chooses to sell their property without the use or help of an agent and to save a commission." *Id.* at 2, ¶ 9. It defines a "FSBO advertisement" as "one that allows a person to advertise their property so that potential buyers can see the advertisement and contact the owner/seller directly without the use of a third party intermediary[.]" *Id.* at 3, ¶ 10.

Defendant was incorporated in 2004 and launched its website in 2006, which provides an online portal for the general public to advertise real property and Realtor services. Plaintiff alleges that Defendant's business depends on its ability to attract advertisers, including by "creating an advertising network and providing leads to its Premier Agents." *Id.* at 2, ¶ 7. Defendant permits FSBO sellers to advertise their real property on its website at no cost; however, Plaintiff contends that "Zillow falsely advertised that it was offering [FSBO] advertisements, because it diverted inquiries on . . . [FSBO] advertisement[s] to its Premier Agents and would also sell the [FSBO] advertisements to its Premier Agents so they would be the only contact listed." *Id.* at 4, ¶ 13.

Defendant's offer of a free "FSBO advertisement" allegedly "stopped [FSBO sellers] from seeking alternative means of advertising their property with competing businesses like [Plaintiff]." (Doc. 24-1 at 5, ¶ 23.) FSBO sellers are alleged to have "lost potential contact[] with purchasers" and were often "forced to pay" Premier Agent

commissions in order to show their properties to potential buyers. *Id.* at ¶ 24. FSBO sellers that did not agree to pay a buyer's commission "would lose the contact as the Premier Agent would direct . . . potential purchasers to other properties, thus depriving the [FSBO sellers] of any benefit from the 'free' [FSBO] advertisement." *Id.* at ¶ 25.

With regard to Defendant's allegedly deceptive practices related to consumers, Plaintiff alleges that when a potential buyer views a property listed with Defendant, there is a "contact" button displayed on Defendant's webpage. *Id.* at 6, ¶ 26. Plaintiff alleges that when the potential buyer clicks on the contact button, he or she is "routed to Zillow and a Premier Agent." *Id.* at ¶ 28. Beginning in November 2017, Plaintiff alleges that a disclaimer was added to Defendant's website, which, in small font, referred to the contact button as a "contact agent" button. (Doc. 24-1 at 6, ¶ 28.) FSBO sellers were not made aware of this "inquiry diversion[.]" *Id.* Plaintiff alleges that, on some advertisements, "the only way to find the phone number for the owner is to scroll through all of the information, including past a page allowing for contact with an agent as well as a section showing nearby properties and similar homes." *Id.* at 6, ¶ 30. Other listings are allegedly devoid of owner contact information. Defendant is alleged to have a phone line that connects interested buyers with Premier Agents when they attempt to ascertain more information after viewing an advertisement. Plaintiff characterizes Defendant's conduct as "converting [FSBO advertisements] into advertisements for its Premier Agents." *Id.* at 8, ¶ 37.

Plaintiff argues that Defendant has "engaged in illegal and unfair methods of competition as well as fraud and deceit" by illegally undercutting its competitors. *Id.* at 11, ¶ 51. Defendant allegedly "priced its goods in such a manner that tended to create or maintain a monopoly" and it "illegally offset the costs associated with offering false [FSBO] advertisement[s] for 'free' to [FSBO sellers] by diverting" buyer inquiries to Premier Agents. (Doc. 24-1 at 11, ¶¶ 52-53.) Plaintiff asserts that FSBO sellers "lost potential sales" from these advertisements because Premier Agents could "redirect" prospective buyers to "other properties if the [FSBO seller] was not willing to share a commission with the Premier Agent" or "properties on which [Premier Agents] c[ould]

obtain more lucrative commissions, such as properties listed by the Premier Agent's agency." *Id.* at 11-12, ¶¶ 55, 57. As a result, Plaintiff alleges FSBO sellers "end up paying a significantly higher cost to sell their property than if they had advertised it with a legitimate [FSBO] publication, like [Plaintiff's,]" which charges a listing fee. *Id.* at 14, ¶ 72.

Plaintiff further asserts that Defendant's "pricing scheme is predatory" because while Defendant "claims it is offering a service for free, [] in reality [it] is converting [FSBO] advertisements into a source of contacts for Premier Agents[.]" *Id.* at 12, ¶ 58. Defendant's actions are alleged to have "destroyed the competitive market for [FSBO] sellers' paid advertising by stealing [FSBO] advertisements and taking them away from [Plaintiff]." *Id.* at 14, ¶ 67.

Plaintiff avers that Defendant's advertising practices have allegedly affected "[h]undreds of thousands, to potentially several million customers" and have caused Plaintiff losses "in the millions of dollars." (Doc. 24-1 at 12-13, ¶¶ 61, 64.) Prior to Defendant's offering free FSBO advertisements on its website, Plaintiff "was enjoying dynamic and consistent growth" and beginning to "expand and franchise its business model." *Id.* at 14, ¶ 69. Between 1994 and 2006, Plaintiff claims that its revenue grew at a compounded annual rate of 16% per year. Its lost profits in 2017 are estimated at $3,400,000. At a projected 16% growth rate, from 2018 to 2030, Plaintiff contends it would have earned over $128,467,758.50 in profits but for Defendant's practices. It alleges it will have lost over $142,000,000 in profits by 2030 and will have additional losses associated with potential expansion and franchising fees that it claims are "in the hundreds of millions of dollars." *Id.* at 16, ¶ 78.

## II.   Conclusions of Law and Analysis.

### A.   Standard of Review.

"[A] district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it 'lacks the statutory or constitutional power to adjudicate it.'" *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "In

resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (internal quotation marks and citation omitted).

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiff must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a plaintiff's complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* (citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

## B.   Whether the Court May Consider Documents External to the Complaint.

As a threshold matter, Defendant contends that Plaintiff's FAC advances the same arguments as its original Complaint, but with "an immaterial semantic twist." (Doc. 29-1 at 5.) "[I]nstead of alleging that Zillow's free FSBO listings are 'not free' because a seller could be contacted by an agent-represented buyer and end up paying a commission, [Plaintiff now] uses the same justification (paying a commission to the buyer's agent) to allege that Zillow's free FSBO listings are 'not FSBO listings' at all." *Id.* In defining a FSBO, which Plaintiff contends is a "term of art[,]" the FAC incorporates the definitions for "FSBO" used on Redfin.com, Nolo.com, and USLegal.com and suggests the court should adopt these definitions as authoritative. (Doc. 24-1 at 3, ¶¶ 11-12.)

To establish that it did not make any misrepresentations, Defendant asks the court to take judicial notice of the FSBO definition published on its own website. Defendant argues that because the FAC "purports to rely on representations made by Zillow but does not reproduce Zillow's actual representations, the [c]ourt should deem [Zillow's] FSBO webpage 'integral to the complaint' and consider it at this stage." *Id.* at 14, n.1. Plaintiff responds that Defendant's "website has changed and there is no proof offered by Zillow when [the applicable] webpage . . . was created or would have been seen by others." (Doc. 32 at 14.)

In reviewing a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the court may consider facts subject to judicial notice, facts alleged in the complaint, "any written instrument attached to [the complaint] as an exhibit[,]" "documents incorporated in [the complaint] by reference[,]" and any documents considered "integral to the complaint." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (internal quotation marks and citations omitted). A document is "'integral'" to the complaint if the complaint "'relies heavily upon [the document's] terms and effect[.]'" *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). "This generally occurs" when the incorporated material is a "legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for

6

some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Id.* at 231 (internal quotation marks and citation omitted). "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (quoting Fed. R. Civ. P. 12(d)).

"[A court] may properly take judicial notice of [a] document" when the document is "publicly available and its accuracy cannot reasonably be questioned." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016); *see also* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). As "matters judicially noticed by the [d]istrict [c]ourt are not considered matters outside the pleadings[,]" the taking of judicial notice does not require the court to convert a motion to dismiss into one for summary judgment. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008). "For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (quoting *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006)).

Defendant's webpage is integral to the FAC because Plaintiff's allegations pertain to the representations contained therein and because FSBO as defined by Defendant may support or "undermine the legitimacy of the [P]laintiff's claim[.]" *Nicosia*, 834 F.3d at 231. According to Defendant, its website advises FSBO sellers that "[y]ou may still have to pay a listing agent commission" and "74 percent of buyers use an agent . . . it's likely your buyer will too." (Doc. 29-1 at 15) (internal quotation marks, citations, and emphasis omitted) (alterations in original). However, because it is disputed whether this version of Defendant's webpage existed in the same form at the time Plaintiff filed its initial

Complaint or its FAC, the court cannot conclude that Plaintiff "'relie[d] heavily upon [the webpage's] terms and effect[.]'" *Nicosia*, 834 F.3d at 230 (citation omitted). Nor may the court find the authenticity of the webpage during the relevant time period is "capable of accurate and ready determination." *Wells Fargo Bank*, 127 F. Supp. at 166 (internal quotation marks omitted). The FSBO definition purportedly used on Defendant's website will thus not be considered for purposes of deciding the pending motion.

In its own request for judicial notice, Plaintiff attaches a self-created graphic to its opposition which allegedly explains a "[t]ypical FSBO Ad[.]" (Doc. 32-2.) Defendant disputes the accuracy of this graphic and contends that the court should decline to consider it pursuant to Fed. R. Evid. 201(b)(2). Because the accuracy of this graphic cannot reasonably be ascertained and it does not appear to reflect facts "generally known within the . . . court's territorial jurisdiction" or facts that "can be accurately and readily determined[,]" Fed. R. Evid. 201(b), the court declines to take judicial notice of it. *See Apotex*, 823 F.3d at 60. The court thus DENIES both parties' requests for judicial notice.

## C. Whether Plaintiff has Standing to Sue on Behalf of FSBO Sellers.

In its August 19, 2021 Opinion and Order, the court held "to the extent that Plaintiff's Complaint c[an] be construed to assert claims on behalf of FSBO sellers who advertised on Defendant's website," any such claims must be dismissed for lack of standing. *Picket Fence Preview, Inc. v. Zillow, Inc.*, 2021 WL 3680717, at *5 (D. Vt. Aug. 19, 2021). Defendant asserts that the FAC nevertheless continues to allege harm to others, and, to the extent it can be construed as asserting third-party claims, Defendant moves to dismiss them pursuant to Fed. R. Civ. P. 12(b)(1). Plaintiff does not address this request in its briefing.

"'Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim[.]'" *Est. of M.D. by DeCosmo v. New York*, 241 F. Supp. 3d 413, 423 (S.D.N.Y. 2017) (quoting *Robinson v. Fischer*, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010)). Any third-party claims in the FAC are therefore DISMISSED.

8

**D.      Whether Plaintiff Plausibly Pleads a VCPA Claim Based upon Unfair or Deceptive Acts or Practices.**

Plaintiff contends that Defendant "engaged in unfair and deceptive trade practices by diverting potential customers away from advertising" with Plaintiff by falsely offering a "FSBO advertisement" for free in violation of the VCPA. (Doc. 24-1 at 21, ¶ 108.) The VCPA prohibits "unfair or deceptive acts or practices in commerce[.]" 9 V.S.A. § 2453(a). "To establish a 'deceptive act or practice' under the [VCPA] requires three elements: (1) there must be a representation, omission, or practice likely to mislead consumers; (2) the consumer must be interpreting the message reasonably under the circumstances; and (3) the misleading effects must be material, that is, likely to affect the consumer's conduct or decision regarding the product." *Carter v. Gugliuzzi*, 716 A.2d 17, 23 (Vt. 1998)). "Whether an act is 'unfair' is guided by consideration of several factors, including (1) whether the act offends public policy, (2) whether it is immoral, unethical, oppressive or unscrupulous, and (3) whether it causes substantial injury to consumers." *Drake v. Allergan, Inc.*, 63 F. Supp. 3d 382, 393 (D. Vt. 2014) (internal quotation marks omitted).

In its previous Opinion and Order, the court determined that Plaintiff did not allege that it purchased, leased, or contracted for any goods or services from Defendant. *See* 9 V.S.A. § 2451a. Accordingly, it held that Plaintiff is not a "consumer" under the VCPA and does not have standing to bring a claim for deceptive acts or practices pursuant to § 2453(a). *Picket Fence Preview*, 2021 WL 3680717, at *5. It also held that Defendant did not represent "that any sales will be 'commission free'" nor offered "any promise that a real estate agent will not be involved" but rather "only promise[d] to FSBO sellers . . . that it will list their real property at no cost to them." *Id.* at *8.

The FAC does not allege that Plaintiff purchased, leased, or contracted for any goods or services from Defendant. Rather, Plaintiff continues to assert the same argument advanced in its original Complaint—that it need not be a consumer to assert its VCPA claims. Plaintiff's approach conflicts with the law of the case, which the court declines to re-examine in the absence of new contrary authority. *See Johnson v. Holder*, 564 F.3d 95,

9

99 (2d Cir. 2009) ("The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'"); *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 378 (S.D.N.Y. 2009), *aff'd*, 374 F. App'x 71 (2d Cir. 2010) (observing that a trial court decision "remains the law of the case" unless reversed on appeal).

Even if the court were to revisit Plaintiff's arguments, the Vermont Supreme Court has reiterated that "[i]n order to recover [for an alleged violation of § 2453 of] the [V]CPA, a plaintiff must establish that they are a consumer." *Messier v. Bushman*, 2018 VT 93, ¶ 24, 208 Vt. 261, 272, 197 A.3d 882, 891; *see also Rathe Salvage, Inc. v. R. Brown & Sons, Inc.*, 2012 VT 18, ¶ 26, 191 Vt. 284, 297, 46 A.3d 891, 902 (stating that "it remain[s] incumbent on [plaintiff] to prove itself a 'consumer' under the [VCPA]").

In response, Plaintiff again cites *Elkins v. Microsoft Corp.*, 817 A.2d 9 (Vt. 2002), for the proposition that under the VCPA, privity of contract between the parties is not a prerequisite to bringing suit. In *Elkins*, the Vermont Supreme Court held that "[t]he language [of the VCPA] does not support the imposition of a privity requirement" and thus an *indirect purchaser* has standing to bring a claim under the statute. *Id.* at 13. The Vermont Supreme Court further found that 9 V.S.A. § 2465 also "authorized indirect purchaser antitrust actions based on a violation of § 2453." *Id.* at 17; *see also D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 500 (E.D. Pa. 2006) (observing that "[t]he purpose" of § 2465 "is to clarify the right of an indirect purchaser to obtain recovery for a violation of [Vermont] antitrust law") (citation omitted). Plaintiff is not an indirect purchaser of Defendant's products or services. Nor did § 2465 "effectuate a change in Vermont law" that would otherwise eliminate Plaintiff's need to establish its status as a consumer when alleging a violation of § 2453. *Elkins*, 817 A.2d at 18.

The VCPA's reliance on the rulings of the Federal Trade Commission provides further guidance.[1] On this point, *Lee v. Conagra Brands, Inc.*, 958 F.3d 70 (1st Cir.

---

[1] Section 2453 states that "the courts of this State will be guided by the construction of similar terms contained in Section 5(a)(1) of the Federal Trade Commission Act as from time to time

2020), is instructive. There, the court determined that a *consumer* plausibly alleged a claim under the deceptive prong of the Massachusetts law prohibiting unfair and deceptive trade practices because Massachusetts, like Vermont, was guided by the Federal Trade Commission Act's interpretation of analogous terms when bringing such a claim. *See id.* at 76; Mass. Gen. Laws Ann. ch. 93A, § 2(b) ("It is the intent of the legislature that . . . the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act[.]"). The FTC has not approved of a claim brought by a competitor who seeks to vindicate the rights of consumers subjected to allegedly deceptive practices.

At oral argument, Plaintiff urged the court to allow a hybrid form of a VCPA claim, arguing that it was for a jury to determine whether it had stated a viable claim for relief. It pointed out that no Vermont Supreme Court precedent foreclosed a hybrid claim. Conversely, Plaintiff conceded that "[t]here aren't any cases" in Vermont recognizing a hybrid VCPA claim because "the statute . . . hasn't been used in th[at] manner." (Doc. 39 at 46.)

Although the VCPA is a remedial statute that is construed liberally, *Elkins*, 817 A.2d at 13, this court is not free to recognize new causes of action unsupported by the authorizing statute. *See id.* at 12 (observing that, when construing a statute, the court evaluates "the plain meaning of the statutory language, because we presume that it reflects the Legislature's intent") (citation omitted). Instead, this court must predict how the Vermont Supreme Court is likely to rule. *See Runner v. New York Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (observing that a federal court's role "is not to adopt innovative theories that may distort established state law. Instead we must carefully predict how the state's highest court would resolve the uncertainties that we have identified") (quoting *The Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005)).

---

amended by the Federal Trade Commission and the courts of the United States." 9 V.S.A. § 2453(b) (footnote omitted).

The VCPA has been the subject of ample litigation in Vermont's courts. It is located in Chapter 63 of the Vermont Statutes titled "Consumer Protection" within Title 9 titled "Commerce and Trade[.]" Sections 2453 and 2461(b) both use the term "consumer[.]" *See* 9 V.S.A. §§ 2453, 2461(b). 9 V.S.A. § 2461c, titled "Predatory pricing[,]" however, does not. Neither the Vermont Supreme Court nor any trial court in Vermont has held that the VCPA authorizes a hybrid claim for deceptive practices brought by a competitor where the challenged practices are alleged to have harmed consumers. The court thus predicts that the Vermont Supreme Court would not recognize such a claim in this case. If a consumer who contracts for Defendant's services reasonably believes it has been deceived or misled, the consumer may bring a claim under § 2453 of the VCPA. Plaintiff, as a competitor, cannot bring a claim for a deceptive practice on the consumer's behalf.

In contrast, § 2461c of the VCPA provides a state analog to the federal antitrust laws. *See* 9 V.S.A. § 2461c(c) (observing that rules adopted to carry out the purposes of that section "shall not be inconsistent . . . with the decisions of the courts of the United States construing federal anti-trust law"). Although it has not been interpreted to the same extent as § 2465 and § 2453, the Vermont Supreme Court has never squarely held that only a "consumer" may bring a claim thereunder. Such an approach would be inconsistent with "federal anti-trust law" which does not limit antitrust claims to consumers.

In summary, the Vermont Legislature has evinced no intent to create a hybrid claim that straddles sections 2453, 2461c, and 2465, cherry-picking elements of each. A consumer, and even an indirect purchaser, may bring a claim under each section of the VCPA. *See* 9 V.S.A. §§ 2461c(a), 2461c(f) (stating "[t]his section shall not be construed to limit rights or remedies available to a person under any other law" and "[a] violation of this subsection is deemed to be an unfair method of competition in commerce and a violation of section 2453 of this title"). A non-consumer competitor may not.

Because the court has already rejected Plaintiff's argument that it need not be a
consumer to allege its claim under § 2465 of the VCPA, Defendant's motion to dismiss
Plaintiff's § 2465 VCPA claim for lack of standing is GRANTED.

## E.    Whether Plaintiff Plausibly Pleads a VCPA Claim Based on Predatory Pricing.

Pursuant to 9 V.S.A. § 2461c of the VCPA, Plaintiff asserts it "is entitled to bring
an action for damages [against Defendant due to Defendant's alleged] predatory pricing
and [Defendant's] attempt to create a monopoly and harm competition." (Doc. 24-1 at 21,
¶ 112.) The VCPA states that "[n]o person, with the intent to harm competition, shall
price goods or services in a manner that tends to create or maintain a monopoly or
otherwise harms competition." 9 V.S.A. § 2461c(a). According to the plain language of
§ 2461c, a plaintiff need not be a "consumer" to bring a claim under this section.[2]

"[P]redatory pricing occurs when a firm 'bites the bullet and forgoes present
revenues to drive a competitor from the market,' with the intent 'to recoup lost revenues
through higher profits when it succeeds in making the environment less competitive.'"
*Franklin Cnty. Sheriff's Off. v. St. Albans City Police Dep't*, 2012 VT 62, ¶ 21, 192 Vt.
188, 197, 58 A.3d 207, 214 (quoting *Kelco Disposal, Inc. v. Browning-Ferris Indus. of
Vt., Inc.*, 845 F.2d 404, 408 (2d Cir. 1988)). "[A] plaintiff seeking to establish
competitive injury resulting from a rival's low prices must prove that the prices
complained of are below an appropriate measure of its rival's costs" and "the competitor
had a . . . dangerous probability[] of recouping its investment in below-cost prices."
*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993)
(applying Section 2 of the Sherman Act). "[P]redatory pricing schemes are rarely tried,
and even more rarely successful[.]" *Weyerhaeuser Co. v. Ross-Simmons Hardwood*

---

[2] Defendant reiterates its argument that all VCPA claims can only be brought by a "consumer[.]"
(Doc. 33 at 9.) The Vermont Supreme Court has not so held, and the language of the relevant
statutory provisions does not support this approach. *Compare* 9 V.S.A. § 2461(b) (permitting a
claim by "[a]ny consumer" alleging a violation of § 2453) *with* 9 V.S.A. § 2461c(e) (permitting a
claim by "[a] person aggrieved" by a violation of that section). Moreover, the Vermont Attorney
General is authorized to enforce the VCPA thereby underscoring that not all claims must be
brought by a consumer. *See* 9 V.S.A. §§ 2461c(d), 2461c(e).

*Lumber Co., Inc.*, 549 U.S. 312, 313 (2007) (internal quotation marks and citation omitted).

In holding the original Complaint failed to plausibly plead the elements of predatory pricing, the court observed:

> Plaintiff asserts that Defendant recoups the cost of offering "free" FSBO
> listings by charging fees for Premier Agents to advertise on those listings. It
> has not, however, alleged that Defendant's free listings are not free to
> FSBO sellers or below an appropriate measure of its costs or that Defendant
> has a dangerous probability of recouping its investment by raising the price
> of the FSBO listings once its competitors have been driven from the
> market. . . . Plaintiff instead concedes that Defendant's revenue is derived
> from real estate agents who pay to advertise on Defendant's website.

*Picket Fence Preview*, 2021 WL 3680717, at *6.

In its FAC, Plaintiff again acknowledges that it does not compete for real estate agent advertising with Defendant, but instead again asserts that because Plaintiff enables a property owner to sell real property without a real estate agent, it is competitively harmed when Defendant offers this same service for free while allegedly directing potential buyers to real estate agents. *See* (Doc. 24-1 at 12, ¶ 58) (alleging Defendant's "pricing scheme is predatory in that Zillow claims it is offering a service for free, but in reality is converting [FSBO] advertisements into a source of contacts for Premier Agents to get them to advertise those advertisements, with the incentive of being able to receive hijacked inquiries from deceived buyers on those advertisements"). Defendant allegedly "illegally offset[s] the costs" associated with its free FSBO advertisements, *id.* at 11, ¶ 53, and, as a result, its "false[ly] advertising" its service for free "means that [Plaintiff] . . . cannot compete[.]" *Id.* at ¶ 12, 60.

Plaintiff does not allege that Defendant's FSBO listings are *not free* to sellers.[3] Plaintiff also does not claim that Defendant has a dangerous probability of recouping its

---

[3] Plaintiff argues in its opposition that Defendant's listing services must be below cost because they are free. *See* (Doc. 32 at 22.) This same allegation is not contained in the FAC, and a party cannot amend its complaint through its brief. *See Palm Beach Mar. Museum, Inc. v. Hapoalim Sec. USA, Inc.*, 810 F. App'x 17, 20 (2d Cir. 2020). The court will nonetheless draw a reasonable inference in Plaintiff's favor that a "free" advertisement is below any actual cost associated with it, whatever that cost may be. In doing so, it is mindful that "[l]ow prices benefit consumers

14

investment by raising the price of FSBO listings in the future. The FAC contains no allegation that Defendant's source of income or pricing methodology will change once competition has been eliminated from the market. Plaintiff instead contends that competition has already been destroyed, not by competitors leaving the marketplace and not by Defendant's alleged monopoly, but by virtue of Plaintiff's own loss of revenue. This will not suffice. *See Brooke Grp. Ltd.*, 509 U.S. at 222 ("[W]e interpret § 2 of the Sherman Act to condemn predatory pricing when it poses 'a dangerous probability of actual monopolization[.]'") (citation omitted); *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986) ("To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result[.]"); *Franklin Cnty. Sheriff's Off.*, 2012 VT 62, ¶¶ 20, 21, 192 Vt. at 197, 58 A.3d at 214 (holding that "[i]t is the protection of competition, rather than the protection of competitors, that antitrust laws are designed to protect" and observing that predatory pricing exists "where a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market") (internal quotation marks and citations omitted).

In terms of consumer impact, Plaintiff does not allege that the average sale price is higher for home sales resulting from Defendant's website or that consumers are forced into using real estate agents against their will. Instead, in vague and conclusory terms, it claims a FSBO seller may lose a sale from a buyer who uses a real estate agent and therefore Defendant has "disrupted and perverted" the entire FSBO marketplace. (Doc. 24-1 at 15, ¶ 73.)

---

regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition[.]" *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993) (internal quotation marks and citations omitted). For this reason, "[e]vidence of below-cost pricing is not alone sufficient to permit an inference of probable recoupment and injury to competition." *Id.* at 226.

Defendant's practices do not preclude consumers from advertising with multiple FSBO listing services simultaneously. They do not foreclose access to Plaintiff's services or to the marketplace, nor do they allegedly cause consumers to pay higher prices. Accordingly, while Plaintiff plausibly alleges competitive harm to itself, it does not plausibly allege present or future harm to consumers or competition through a FSBO seller's use of Defendant's website. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 903 (9th Cir. 2008) (explaining that "antitrust laws do not punish economic behavior that benefits consumers and will not cause long-run injury to the competitive process" even if individual competitors may suffer).

"Unless low prices today will come with high prices tomorrow, only good things happen for consumers." *Energy Conversion Devices Liquidation Tr. v. Trina Solar Ltd.*, 833 F.3d 680, 685 (6th Cir. 2016). For a predatory pricing claim to proceed, the "prerequisites to recovery are not easy to establish, but they are not artificial obstacles to recovery; rather, they are essential components of real market injury." *Brooke Grp. Ltd.*, 509 U.S. at 226. "It would be ironic indeed if the standards for predatory pricing liability were so low that antitrust suits themselves became a tool for keeping prices high." *Id.* at 226-27.

Because Plaintiff fails to plausibly plead the essential elements of a predatory pricing claim under § 2461c, Defendant's motion to dismiss Plaintiff's § 2461c VCPA claim is GRANTED.

### F.      Whether Plaintiff Plausibly Pleads a Lanham Act Claim.

Defendant contends that Plaintiff's theory of liability regarding Defendant's FSBO advertisements continues to erroneously address the represented status of the *buyer*, which is "irrelevant" because FSBO listings are "listing[s] made *for sale by* an unrepresented *owner/seller*" and Defendant undisputedly allows sellers to list their property for free on its website. (Doc. 29-1 at 6) (emphasis in original). For this reason, Defendant argues that Plaintiff's Lanham Act claim is not supported by statements which are literally or impliedly false.

Pursuant to 15 U.S.C. § 1125(a):

16

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

"To prevail on a Lanham Act false advertising claim, a plaintiff must establish that the challenged message is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016) (citing *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255-56 (2d Cir. 2014)). "Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) (internal quotation marks omitted). "Further, statements of opinion or puffery are nonactionable under the Lanham Act." *Suozzo v. Beck Chevrolet Co., Inc.*, 2022 WL 428424, at *3 (S.D.N.Y. Feb. 11, 2022) (citing *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 539-543 (S.D.N.Y. 2018)). "If an advertising message means something different from what reasonable consumers would understand it to mean, that message can be considered false." *Church & Dwight Co.*, 843 F.3d at 66 (citation omitted).

"To establish literal falsity, a plaintiff must show that the advertisement either makes an express statement that is false or a statement that is 'false by necessary implication,' meaning that the advertisement's 'words or images, considered in context,

necessarily and unambiguously imply a false message.'" *Id.* at 65 (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)). "A message can only be literally false if it is unambiguous." *Id.* "When determining whether an advertisement is 'literally false,' a court 'may rely on its own common sense and logic in interpreting the message of the advertisement.'" *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 638 (S.D.N.Y. 2018) (citation omitted).

To be impliedly false, the statement must be "likely to mislead or confuse consumers." *Apotex*, 823 F.3d at 63 (internal quotation marks and citation omitted). "Such an implicit falsity claim requires a comparison of the impression left by the statement, rather than the statement itself, with the truth." *Id.* (internal quotation marks, citation, and alterations omitted).

In its August 19, 2021 Opinion and Order, the court found that Defendant's promise of a "free" FSBO listing was not literally false because "Defendant does not charge sellers to post FSBO listings on its website" and further ruled the statement was not impliedly false because Plaintiff "fail[ed] to point to any representation by Defendant that any sales will be 'commission free' or any promise that a real estate agent will not be involved in a subsequent sale." *Picket Fence Preview*, 2021 WL 3680717, at *8.

The FAC revises Plaintiff's Lanham Act claim to allege that Defendant's website cannot properly be characterized as offering a "[FSBO] advertisement" and is on that basis "false." (Doc. 24-1 at 4, ¶ 13.) In terms of literal falsity, Plaintiff does not allege Defendant uses the phrase "FSBO advertisement" on its website. Rather, Defendant's website states FSBO sellers may "[p]ost a listing for free, including video and unlimited photos." (Doc. 24-4.) Plaintiff nonetheless offers three alternate definitions of "FSBO[,]" each of which define the term as property sold without the use of a seller's agent, to support its argument that Defendant's offering of a "FSBO" listing is false. (Doc. 24-1 at 3, ¶ 12.) Because Plaintiff concedes that FSBO sellers on Defendant's website are *not* required to hire a real estate agent in order to list their real property for free, Defendant's representation, which does not use the term "FSBO advertisement[,]" is not literally false. *See Lokai Holdings*, 306 F. Supp. 3d at 638 ("For a statement to be "literally false" or

18

false on its face, it must conflict with reality.") (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999)).

In terms of implied falsity, "[a]t the pleading stage, the plaintiff must allege that consumers or retailers were misled or confused by the challenged advertisement and '*offer facts* to support that claim.'" *Id.* at 639 (citation omitted) (emphasis in original). The FAC contains the following support for consumer deception:

> Picket Fence is aware that For-Sale-By-Owners would cho[o]se a free
> advertisement on Zillow versus paying for an advertisement on Picket
> Fence, since they assumed a free advertisement [like] this would be a
> cheaper alternative. . . . Had proper disclosures been made to potential For-
> Sale-By-Owners, they would have been able to compare the advantages of
> using a service such as Picket Fence and paying a modest fee to advertise
> their property. Picket Fence had former Zillow [FSBO] customers complain
> about the deception on Zillow and specifically said had they known the
> truth about how Zillow operated its website and their [FSBO]
> advertisements, they would have chosen to advertise with Picket Fence.

(Doc. 24-1 at 20, ¶¶ 103-04.) Plaintiff claims this resulted in "an illegal transfer of wealth from the seller to Zillow" and asserts this is "not what the community expects" from a FSBO advertisement. (Doc. 32 at 17.)

While the lack of extrinsic supporting evidence or even factual details in the complaint is not necessarily "fatal at the pleading stage[,]" *see Lokai Holdings*, 306 F. Supp. 3d at 639 n.2 (citations omitted), Plaintiff's allegations regarding consumer deception are both vague and conclusory. Assuming *arguendo* their adequacy, they do not render Defendant's representations, which are not described in the FAC, false. A property owner who seeks to sell his or her real property without using a real estate agent may list the property for free on Defendant's website. Defendant is not alleged to have *required* these sellers to use real estate agents at any point in the transaction. Defendant is not alleged to have *promised* a real estate agent would not be involved or *represented* that a subsequent sale would be commission free. Plaintiff thus does not allege that Defendant "uses in commerce" a "false or misleading description of fact, or [a] false or misleading representation of fact[.]" 15 U.S.C. § 1125(a)(1). The FSBO definitions proposed by Plaintiff do not alter this conclusion; Defendant does not use those definitions.

Defendant's offer of a free FSBO listing focuses on a preliminary step in a real estate transaction, the advertising of a property for sale, with no guarantee as to what may happen thereafter. A FSBO seller remains free to decide with whom and how it wants to sell any property it lists on Defendant's website. Stated differently, a FSBO seller may refuse to deal with a real estate agent and refuse to pay a commission. Because Plaintiff has not identified a statement made by Defendant that is "either literally or impliedly false," *Church & Dwight Co.*, 843 F.3d at 65, within the meaning of 15 U.S.C. § 1125(a)(1), Defendant's motion to dismiss Plaintiff's Lanham Act claim must be GRANTED.

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendant's motion to dismiss (Doc. 29). Because the court has previously granted Plaintiff leave to amend, it does not grant leave to amend for a second time *sua sponte*.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _23_ day of August, 2022.

Christina Reiss, District Judge
United States District Court

20